900 P.2d 1322

**STATE of Hawai'i, Plaintiff–Appellee,**

**v.**

**Louis Anthony CORELLA, also known as "Ouiji", Defendant–Appellant.**

**No. 16842.**

Intermediate Court of Appeals of Hawai'i.

July 6, 1995.

resume work until permitted to do so by the        Planning Director.

Joyce K. Matsumori–Hoshijo, Deputy Public Defender, on the briefs, Honolulu, for defendant-appellant.

Michael J. Udovic, Deputy Pros. Atty., County of Hawai'i, on the brief, Hilo, for plaintiff-appellee.

Before BURNS, C.J., and WATANABE and ACOBA, JJ.

ACOBA, Judge.

Defendant–Appellant Louis Anthony Corella (Defendant) was indicted on October 30, 1991 for Kidnapping, in violation of Hawai'i Revised Statutes (HRS) § 707–720(1)(d) (Supp.1992),[1] and Sexual Assault in the First

---

1. Hawai'i Revised Statutes (HRS) § 707–720(1)(d) (Supp.1992) provides:

A person commits the offense of kidnapping if the person intentionally or knowingly restrains another person with intent to:

Degree, in violation of HRS § 707–730(1)(a) (Supp.1992).[2] A jury found Defendant guilty as charged on December 3, 1992.[3] He was sentenced on January 14, 1993 to imprisonment for ten years on the kidnapping conviction and twenty years on the sexual assault conviction.

Defendant appeals his convictions on the grounds that (1) the trial court erred by (a) limiting cross-examination about the complaining witness's (Complainant) relationship with her boyfriend, and (b) receiving a "victim compensation form" into evidence; and (2) Complainant testified about two alleged prior bad acts by Defendant. We vacate the judgment of conviction and remand the case for a new trial.

## I.

Complainant testified at trial that she accompanied her fiancé (Fiancé) to his baseball game in Keaukaha on the Island of Hawai'i on May 25, 1991. Fiancé had stayed the previous night at her home, and they had had sexual relations. During the day, she consumed a six-ounce margarita and a few sips of beer. She and Fiancé argued, and she went to a store which was about a ten- to fifteen-minute walk from the baseball field. It was about a half hour before dark. Complainant intended to call her mother from a pay telephone but dialed the wrong number. After waiting for a few minutes at the store, she decided to walk back to the baseball field. On her way back she met Defendant.

She knew Defendant was a friend of Fiancé because he played on the same baseball team with Fiancé. Informed by Defendant that Fiancé was looking for her, Complainant accepted Defendant's invitation to enter his car.

After stopping at a gas station, Defendant proceeded on the highway leading to Kea'au. When Complainant asked him where they were destined, he replied "home." She asked him to drive to Fiancé's house, but he maintained that he would take her home and continued towards Kea'au. Complainant pressed Defendant to turn down a road to reach Fiancé's house or to stop so that she could contact her mother. Instead, Defendant moved on to a different road; but when he reached a stop sign, he reversed direction and headed towards Kea'au again. After they reached Kea'au, Complainant again made the same request. Defendant assured her that it was not a problem for him to continue on to her home.

While traveling between Kea'au and Pāhoa, Defendant placed his hand on her leg several times. She repeatedly pushed it away.

Later, Defendant passed the highway exit to Complainant's home. When she mentioned this, Defendant acknowledged that "he knew that." Although she instructed him to return, he drove instead towards Kalapana. At a wide section of the road, Complainant repeated her previous demand. Not heeding her directions, Defendant entered and drove down a dirt road for about a quarter of a mile.

After stopping the car, Defendant wanted to talk. In response, Complainant reiterated

....
(d) Inflict bodily injury upon that person or subject that person to a sexual offense[.]

2. HRS § 707–730(1)(a) (Supp.1992) states that, "A person commits the offense of sexual assault in the first degree if: ... [t]he person knowingly subjects another person to an act of sexual penetration by strong compulsion[.]" " 'Sexual penetration' " includes "vaginal intercourse[.]" HRS § 707–700 (Supp.1992).

"Strong compulsion" means the use of or attempt to use one or more of the following to overcome a person:

(1) A threat, expressed or implied, that places a person in fear of bodily injury to the individual or another person, or in fear that the person or another person will be kidnapped;
(2) A dangerous instrument; or
(3) Physical force.
*Id.* Factually, Count I of the Indictment alleged that Defendant did "restrain [the complaining witness (Complainant) ] with intent to subject her to a sexual offense," and Count II alleged that Defendant "insert[ed] his penis into her vagina."

3. The verdict forms were dated November 3, 1992, but the transcript and filing date of the forms establish the date as December 3, 1992.

her desire to return home. But he then tried to kiss her. Saying that she did not want him to do that and that it was not fair to Fiancé, Complainant pushed him away. She struggled with Defendant for ten minutes, during which time Defendant committed an act of sexual penetration. She told him " 'No, no, Louis [ (Defendant) ]. I don't want to. Please stop.' "

Subsequently, Defendant drove her home, attempted to kiss her, expressed his wish to see her again, and asked whether she would report the incident to Fiancé. Because Defendant had imparted that the encounter would be their secret, she said she would inform Fiancé that an acquaintance had brought her home.

Complainant called her mother (Mother) to make arrangements for transporting her children from Mother's house. Inquiring whether anything was "wrong," Mother explained that Fiancé had been trying to locate her. Complainant related that Defendant had "forced himself" on her. While she was speaking to Mother, Fiancé arrived. He also questioned her and she described the evening's events. Mother arrived thereafter, and both she and Fiancé convinced Complainant to report the assault to a rape crisis center and to go to a hospital.

Mother verified that Complainant contacted her. She sensed that something was amiss, and she ascertained that Complainant had been assaulted. Mother attempted to comfort Complainant and suggested the police be called.

Fiancé testified that he and Complainant had gone to the baseball field. They had had a "fight," and Complainant left. Notifying him that Complainant had asked to borrow a quarter for a telephone call, his coach urged Fiancé to find her. Defendant was with him when the coach spoke with Fiancé. Night was approaching when Fiancé left the park. He believed Complainant might have hitchhiked. He left for home and called Mother who informed him that she had not heard from Complainant. Returning to the park, he did not come upon anyone who had seen her. He drove slowly to Complainant's home, searching for her on the side of the highway. At a certain point, he concluded that she must have obtained a ride. When he reached Complainant's house and saw her, he discerned that something was "wrong." After some prompting, she recounted that Defendant had raped her.

One of Defendant's co-workers testified that Defendant said that he had engaged in "sex" with a "girl" and she had then accused him of kidnapping and sexual assault. Defendant revealed that the police were to examine his car for evidence, but because he had "vacuumed" it, they would not discover anything.

In his opening statement, defense counsel did not deny that Defendant and Complainant had engaged in sexual intercourse, but contended that the intercourse was consensual. Under HRS § 707-730(1)(a), the issue, then, was whether Defendant had "subject[ed] [Complainant] to an act of sexual penetration by strong compulsion." [4]

Defendant did not testify. In presenting his case, Defendant called the nurse and doctor who attended Complainant at the hospital. The nurse testified that Complainant explained she did not resist Defendant because she was frightened. The medical report disclosed Complainant did not suffer any bruising, swelling, lacerations, or abnormalities. Revealing that he had not found any trauma to Complainant's vagina, the doctor opined that this finding would not indicate whether penetration had taken place or not. Complainant had not complained of any special pains or injuries.

Defendant introduced into evidence the shorts, bathing suit top, and underwear Complainant had been wearing on the evening in question. Parts of the underwear had been removed for testing by the Federal Bureau of Investigation, but the results of any tests were not submitted in evidence.

---

4. See note 2, *supra*.

## II.

Defendant contends, first, that the trial court erred in limiting cross-examination of Complainant. On cross-examination, defense counsel had established that Complainant was living in her brother's house. The State objected to Defendant's inquiry of whether Complainant paid rent. Defense counsel made the following offer of proof:

> I intend to show that this woman was at least partly financially dependent on [Fiancé], and that in—unless she concocted a story about a rape to save the relationship, that she would (A) possibly get beaten by him; (B) left by him; (C) be cut off financially from whatever help he was giving her, or whatever help she was expecting to get from him. And that these are part—part of the motivations as to why she made a consensual act of intercourse into a forcible act, because she knew and feared that he would find out about it before that next day. It was the only thing to cover herself and protect her—her relationship or source of future financial gain and source of support was to make it, uh, non-consensual.
>
> . . . .
>
> . . . Judge, I intend to ask—I would like to ask her, unless you [sic] precluding me, about sources of income to show that she was dependent on this man and she feared losing him if he that—the truth. . . .
>
> . . . .
>
> . . . I have reason to believe this woman had no source of income. I'm—make the offer of proof that this woman had two children, was receiving no support and was on welfare. She was getting financial help from [Fiancé]. . . . [S]he knew that if he found out that she just had sex with his best friend she had expected to be thrown out from [sic] him and cut off from him.

However, the trial court sustained the State's objection.

The scope of cross-examination is generally within the sound discretion of the trial court. *See State v. Silva,* 67 Haw. 581, 587, 698 P.2d 293, 296 (1985); *State v. Pokini,* 57 Haw. 17, 22, 548 P.2d 1397, 1400 (1976) (cross-examination of defendant). While the right of cross-examination, protected by the Confrontation Clause of the Sixth Amendment, "may not be unduly restricted, . . . it has never been held that this right is absolutely without restriction." *State v. Jones,* 62 Haw. 572, 578, 617 P.2d 1214, 1219 (1980) (citation omitted). *See also Pokini,* 57 Haw. at 23, 548 P.2d at 1400–01 (right to cross-examination may be overridden by the right to a fair trial). However, a witness may be cross-examined on matters bearing upon the witness's credibility, *Jones,* 62 Haw. at 578, 617 P.2d at 1219, biases, prejudices, or ulterior motives. *State v. Liuafi,* 1 Haw.App. 625, 630, 623 P.2d 1271, 1275 (1981). *See* Hawai'i Rules of Evidence (HRE) Rule 609.1. In fact, "[c]ross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested." *Davis v. Alaska,* 415 U.S. 308, 316, 94 S.Ct. 1105, 1110, 39 L.Ed.2d 347 (1974). Thus, "the exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination." *Id.* at 316–17, 94 S.Ct. at 1110. For that reason,

> a criminal defendant states a violation of the Confrontation Clause by showing that he [or she] was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, and thereby to expose to the jury the facts [from] which jurors . . . could appropriately draw inferences relating to the reliability of the witness.

*Olden v. Kentucky,* 488 U.S. 227, 231, 109 S.Ct. 480, 483, 102 L.Ed.2d 513 (1988) (internal quotation marks omitted).

In *Olden,* the defendant testified that the complaining witness had consented to having sexual relations with him. After the incident, the witness's boyfriend had seen the defendant leaving the witness at the boyfriend's home. The defense argued that the witness lied about her contact with the defen-

dant because she feared jeopardizing her relationship with her boyfriend. In furtherance of that theory, the defendant sought to question the witness about her then current cohabitation[5] with her boyfriend, but the trial court prohibited such questioning.[6] The United States Supreme Court held that the trial court erred because " '[a] reasonable jury might have received a significantly different impression of [the witness's] credibility had [defense counsel] been permitted to pursue his proposed line of cross-examination.' " *Olden*, 488 U.S. at 232, 109 S.Ct. at 483. (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 680, 106 S.Ct. 1431, 1435, 89 L.Ed.2d 674 (1986)) (alterations in the original).

Hence, in a sexual assault case, the complaining witness's possible motivation in asserting that the sexual encounter was not consensual, to protect his or her relationship with another person, is a "prototypical form of bias on the part of" the complaining witness. *Id.* at 231, 109 S.Ct. at 483. Here, defense counsel had sufficiently demonstrated the relevancy of his line of questioning because it was directed at Complainant's alleged motivation in denying that she consented to sexual contact.

Had the jury received the information regarding Complainant's possible motivation for allegedly fabricating her account of the sexual assault, we cannot say that the jury could not have had a " 'significantly different impression of [the witness's] credibility[.]' " *Id.* at 232, 109 S.Ct. at 483 (quoting *Van Arsdall*, 475 U.S. at 680, 106 S.Ct. at 1435). Unquestionably, the preclusion of such questioning was not harmless beyond a reasonable doubt. *Liuafi*, 1 Haw.App. at 630, 623 P.2d at 1275 (violation of constitutional right of confrontation is subject to the harmless beyond a reasonable doubt standard). *See State v. Silva*, 78 Hawai'i 115, 125, 890 P.2d

702, 712 (App.1995) (errors involving fundamental constitutional rights are subject to the harmless beyond a reasonable doubt standard). This case hinged on whether or not the jury believed Complainant's testimony that she was subjected to an act of sexual penetration by strong compulsion. Accordingly, there was "a reasonable possibility that the error might have contributed to the conviction." *Liuafi*, 1 Haw.App. at 630, 623 P.2d at 1275 (quoting *Pokini*, 57 Haw. at 34, 548 P.2d at 1402).

We hold, thus, that the trial court erred in limiting questioning regarding Complainant's financial situation and her relationship with Fiancé, and that this error was not harmless. As a result, we must remand the case for a new trial. Because the case will be remanded, we address the other two assignments of error; although under our disposition, we need not determine whether any other error would also require a new trial.

### III.

Defendant disputes the court's receipt of a "criminal victim's compensation form" (the Form) in evidence.

Apparently seeking to establish that Complainant's motive in accusing Defendant might also be financial gain, defense counsel asked Complainant whether she had completed an application for compensation as a victim of a violent crime.[7] After initially stating that she had not, Complainant testified that she had dictated a statement to a person from the Rape Crisis Center. She believed the Form was for her grand jury hearing. In attempting to rebut this last portion of her testimony, defense counsel read and paraphrased the first paragraph of the Form which described the Form's compensatory purpose:

---

5. At the time of the incident, the complaining witness and her boyfriend were not living together because they were married to other people.

6. The trial court's rationale was that the probative value of the question was outweighed by its prejudicial value because the complaining witness was Caucasian and her boyfriend was African–American.

7. Compensation for victims of crimes is governed by HRS chapter 351 (1985, Supp.1992, and Comp.1993).

"The commission may compensate the victim for pain and suffering as a result of—of crime."

Then it goes on, "To assist the commission in understanding the pain and suffering you experienced you are asked to write a statement about what you went through, and how you have suffered, in order to assist the commission in determining what kind of compensation you're entitled to."

Complainant could not recall whether she had read that part of the Form but insisted that had she known its purpose, she would not have made a statement.[8] The defense did not seek to move the Form into evidence.

On redirect examination by the State, Complainant added that the statement was an accurate reflection of her feelings at that time and was made about a week after the incident. The State had the Form marked for identification.

At the end of the trial day, the State moved the Form into evidence over the defense's objection. The State maintained that the remainder of the document must be disclosed to the jury because defense counsel had only read a portion of it into the record, and it supported Complainant's testimony about her feelings which had been brought up in both direct and cross-examination. The court received the Form in evidence but, in deference to a defense objection, redacted from the statement the words, " 'I was aware that he had been physically abusive to his girlfriend, that he hurt her, and I was afraid he was going to physically hurt me too.' "

That part of Complainant's statement (the statement) in evidence read:

At the time of the assault I had a numbing sensation I couldn't feel anything. [redacted section] During the assault, I felt dirty, gross, that he violated myself—he took myself from me. Directly following the assault I felt really frantic and confused about what to do. I couldn't believe it had happened. I felt like I was in a daze. Since the assault I've had alot [sic] of anxiety and fear of seeing him since he is a person I know and he knows where I live. I've been really fearful. I've been jumpy and jittery and nervous. Sometimes I get grumpy at others. For the first several weeks afterwards and sometimes still now I experience alot [sic] of emotion. I've had nightmares and disturbed sleep. I still keep thinking about it. I've been experiencing headaches and it's been hard sometimes to interact with others; especially people that knew him and knew what happened.

I'm scared about seeing him and don't know what will happen in court. I still worry about if I got AIDS from him.

The prosecution read the Form to the jury in its final argument.

Receipt of the statement poses several issues which we examine.

### A.

▆ Assuming that the first paragraph on the Form was used to impeach Complainant, the entire statement was not admissible as a prior consistent statement under HRE Rule 613(c) as urged by the State.[9] Defense counsel utilized the first paragraph to refute

8. Complainant's testimony on whether she read the Form is ambiguous. After reviewing the Form in court, she acknowledged that the "first line" concerned compensation for pain and suffering and explained "this . . . was because of my concern for having Aids [sic], and it's pending." A few questions later she stated, "I used the wrong wording. I have no idea what is going on with that." However, we are only concerned on appeal with the reasons propounded by the State for offering the Form in evidence.

9. Hawai'i Rules of Evidence Rule 613(c) provides:

Prior consistent statement of witness. Evidence of a statement previously made by a witness that is consistent with the witness' testimony at the trial is admissible to support the witness' credibility only if it is offered after:
(1) Evidence of the witness' prior inconsistent statement has been admitted for the purpose of attacking the witness' credibility, and the consistent statement was made before the inconsistent statement; or
(2) An express or implied charge has been made that the witness' testimony at the trial is recently fabricated or is influenced by bias or other improper motive, and the consistent

Complainant's assertion that she believed the Form was for grand jury testimony and not for financial compensation. The statement, explaining "how the crime affected [her,]" largely describes post-incident feelings and does not demonstrate that she expected the Form to be used for grand jury purposes. Thus, the statement is not a prior statement which was consistent with the testimony impeached. *See State v. Altergott,* 57 Haw. 492, 504, 559 P.2d 728, 736 (1977) (case on which HRE Rule 613(c)(3) is based (Commentary to HRE Rule 613(c)(3) (1985))); *In re a Male Minor Child,* 1 Haw.App. 364, 372, 619 P.2d 1092, 1098 (1980) (consistent statement is used to refute the inconsistent statement). Therefore, we hold that a claimant's response to a criminal victim compensation form's directive to "provide a written statement [about] how the crime affected you" is not a prior consistent statement under HRE Rule 613(c) when offered to support the credibility of the claimant's trial testimony that he or she was not seeking compensation, in the absence of an expression to that effect in the response itself.

■ Nor is the statement admissible under HRE Rule 613(c) to buttress Complainant's testimony about her post-incident feelings because defense counsel did not attack Complainant's credibility on this subject, by one of the three means required by HRE Rule 613(c). *State v. Palabay,* 9 Haw.App. 414, 427, 844 P.2d 1, 8 (1992) (credibility of witness must be "attacked by one of three means: (1) a prior inconsistent statement; (2) a charge that the witness's testimony was recently fabricated or influenced by bias or improper motive; or (3) an imputation that the witness had an inaccurate memory").

### B.

We also do not agree with the State's proposed justification for the admission of

the statement under HRE Rule 106. HRE Rule 106 states:

**Rule 106 Remainder of or related writings or recorded statements.** When a writing or recorded statement or part thereof is introduced by a party, an adverse party may require the party at that time to introduce any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it.

■ At the outset, we do not perceive any difference between a writing introduced as a trial exhibit and a writing read into the record by counsel for the purpose of determining the admissibility of material "which ought in fairness to be considered contemporaneously with" the original writing. Obviously, the manner in which a writing or statement is first introduced should not govern whether additional materials should be received to afford the factfinder a complete and accurate account of the subject matter at issue. We hold, as a result, that HRE Rule 106 applies to statements "introduced" at trial by being read to a witness. *Cf. Monlux v. General Motors Corp.,* 68 Haw. 358, 714 P.2d 930 (1986) (under the facts, defense attorney read portions of statement to witness). Under HRE Rule 106, a document is "introduced" when the document is " 'utilized in court' " (as it was here) by a party. 21 C. Wright & K. Graham, *Federal Practice and Procedure: Evidence* § 5075, at 358 (1977).

■ However, the statement was not a writing "which ought in fairness to be considered contemporaneously" with the Form's opening paragraph. *See id.* § 5077. The objective of Rule 106 is to ensure that a writing should be considered as a whole when " 'the thought as a whole, and as it actually existed, cannot be ascertained without taking the utterance as a whole and comparing the successive elements and their

statement was made before the bias, motive for fabrication, or other improper motive is alleged to have arisen; or
(3) The witness' credibility has been attacked at the trial by imputation of inaccu-

rate memory, and the consistent statement was made when the event was recent and the witness' memory fresh.

mutual relations.'" *Monlux*, 68 Haw. at 366, 714 P.2d at 935 (quoting 7 Wigmore, *Evidence* § 2094, at 595 (Chadbourn rev. ed. 1978)) (emphasis omitted). Here, the purpose of the Form was unambiguously established by the first paragraph without resort to any other part of the document. Complainant's statement merely supplied the information requested by the Form. It was not essential to explain or complete the "thought" of the introductory paragraph, which openly described the Form's purpose. Therefore, if a criminal victim's compensation form is used at trial solely to establish that compensation was sought, the claimant's response to the form's request for information is not admissible under HRE Rule 106 as a statement "which ought in fairness to be considered contemporaneously" with that part of the document describing its compensatory purpose.

## C.

No other reasons are proffered by the State for receipt of the Form. Assuming another basis may exist for admitting all or parts of the statement, its probative value must still be explored.

The reference to "AIDS" was undoubtedly irrelevant. HRE Rule 402. Under HRE Rule 403, parts of the statement may be cumulative. For example, after defense counsel confronted Complainant with the Form but before it was offered in evidence, the prosecutor had Complainant confirm that she was fearful of Defendant after the alleged assault. In this regard, on remand and retrial, the trial court should scrutinize the statement and its parts in conjunction with HRE Rule 403.

## IV.

Lastly, Defendant claims that two responses by Complainant in cross-examination were non-responsive and, in the aggregate, prejudicial. In the first response, Complainant stated she knew that Defendant had been violent in the past. The judge struck this remark from the record. Soon after the first response, Complainant stated that Defendant had "fondled" other women in public. The judge refused to strike this comment.

## A.

The first response was made in the following context:

Q. [(Defense attorney)] [Defendant] did not strike you in any way; is that a fair statement?

A. [(Complainant)] That is a fair statement. [Defendant]—

Q. Just [sic] asked you if he had stricken you, if he had attempted or actually hit you in any way up to this point?

A. No.

Q. Okay.

A. I am aware of his violence in the past.

[Defense attorney]: I move that that be stricken from the record and the jury be instructed to disregard that comment.

THE COURT: So ordered. The jury will disregard the last remark.

Defendant submits that the unfair prejudice resulting from Complainant's unsolicited reference to Defendant's alleged prior bad acts was not cured by the trial court's prompt instruction. The Supreme Court of Hawai'i has held that " 'any harm or prejudice resulting to the defendant [from a remark by a witness for the prosecution] can be cured by the court's instructions to the jury. In such cases it will be presumed that the jury adhered to the court's instructions.' " *State v. Samuel*, 74 Haw. 141, 149 n. 2, 838 P.2d 1374, 1378 (1992) (quoting *State v. Amorin*, 58 Haw. 623, 629, 574 P.2d 895, 899 (1978)). Even so, there are instances where a "deliberate and unresponsive injection by [a] prosecution [witness] of irrelevant references to prior ... [bad acts] may generate insurmountable prejudice to the cause of an accused." *State v. Kahinu*, 53 Haw. 536, 549, 498 P.2d 635, 643 (1972), *cert. denied*, 409

U.S. 1126, 93 S.Ct. 944, 35 L.Ed.2d 258 (1973).

### B.

The colloquy that gave rise to the second response was as follows:

Q. [Complainant], didn't, you know—let's be honest with—honest with each other. After everything you have testified that happened, your response is—you recall the dialogue with [Defendant], he turned past your place, he goes down few miles, he goes up the dirt road, he shuts the ignition, you know, shuts the lights off, he slips across the bench seat, tries to kiss you, and you don't know what—what's about to happen or what he wants?

A. I couldn't believe that [Fiancé's] best friend and somebody that I had been acquainted with would do anything to me that [Defendant] had done.

Q. Well, you did not believe that may be [sic] he might try to have sex with you after he kept putting his hands on your leg, you told us, repeatedly between Keaau [Keaʻau] and Pahoa [Pāhoa]? You kept saying he kept repeatedly putting his hands on—on your thigh, didn't he?

A. Sir—

Q. What does that tell you, [Complainant]? He repeatedly puts his hand on thigh—on your thigh, you're repeatedly pushing his hand away, and he's repeatedly putting his hands back on your thigh. [Complainant], what do you think it is he wants to do there?

A. Sir, [Defendant] has fondled several women—

[DEFENSE ATTORNEY]: I object.

A. —in public.

[DEFENSE ATTORNEY]: I object, and move that that be stricken from the evidence. I asked what she thought was happening. That's a gratuitous comment of the—

[DEPUTY PROSECUTING ATTORNEY]: I also—Your Honor, counsel opened this. He—

THE COURT: I think she [sic] answering you as best way [sic] she can. Overruled.

A trial court's admission of testimony is reviewed for abuse of discretion. *See State v. Faulkner*, 1 Haw.App. 651, 654, 624 P.2d 940, 943 (1981) ("the admissibility of evidence, generally, and the scope of cross-examination at trial"). The proper remedy for a non-responsive or improper answer to a proper question is to have the answer stricken. *State v. Hashimoto*, 46 Haw. 183, 195, 377 P.2d 728, 736 (1962). As with the prior considered remark, Complainant's answer here was not specifically responsive to defense counsel's question.

### V.

For the reasons stated in Part II, we vacate the January 14, 1993 Judgment and remand the case for a new trial.