82 P.3d 818

**STATE of Hawai'i, Plaintiff–Appellee,**

v.

**Ronald MONTGOMERY, Defendant–Appellant.**

**No. 24809.**

Intermediate Court of Appeals of Hawai'i.

Dec. 18, 2003.

As Amended Dec. 23, 2003.

Certiorari Denied Jan. 30, 2004.

374

Chester M. Kanai, Honolulu, on the briefs, for defendant-appellant.

Loren J. Thomas, Deputy Prosecuting Attorney, City and County of Honolulu, on the briefs, for plaintiff-appellee.

BURNS, C.J., WATANABE and LIM, JJ.

Opinion of the Court by LIM, J.

Ronald Montgomery (Montgomery) appeals the December 3, 2001 judgment of the circuit court of the first circuit that convicted him, upon a bench trial,[1] of sexual assault in the first degree, a violation of Hawai'i Revised Statutes (HRS) § 707–730(1)(b) (1993).[2] Montgomery was sentenced to an indeterminate term of imprisonment of twenty years. On appeal, Montgomery stakes out three primary points of error:

A.  Independent Counsel's Failure To Advise The Grand Jury and The Deputy Prosecutor's Instruction To Witness Not To Answer Grand Jury Question Was Prejudicial Error[.]

 . . . .

1.  The Honorable Karen S.S. Ahn, judge presiding.

2.  Hawai'i Revised Statutes (HRS) § 707–730(1)(b) (1993) provided, in relevant part, that, "A person commits the offense of sexual assault in the first degree if:.... The person knowingly subjects to sexual penetration another person who is less than fourteen years old[.]" (Enumeration omitted; format modified.)

B. The Trier–Of–Fact Erred By Finding Appellant Montgomery Guilty and By Denying Judgment of Acquittal After Verdict of Guilty.

. . . .

C. The Admission Into Evidence of (1) [the complaining witness's] Unrecorded Interview With Hinda Diamond Held On 11–9–98, Along With State's Exhibits 1–4, and (2) [the complaining witness's] Videotaped Interview With Hinda Diamond Held On 11–12–98, Was Error.

We do not agree there was prejudicial error in this case. Accordingly, we affirm.

## I. Background.

On July 14, 1999, the grand jury indicted Montgomery on one count of sexual assault in the first degree. On August 31, 2001, Montgomery waived his right to a jury trial. His bench trial started on September 4, 2001.

Dr. Stanton Michels (Dr. Michels) testified that on November 13, 1998, he conducted a physical examination of the complaining witness (the CW), who was then four-and-a-half years old (date of birth, March 25, 1994). This was a non-emergency, non-acute examination, because it was administered more than seventy-two hours after the reported incident. Dr. Michels described the CW as "more communicative than the average four year old that comes in[.]" Dr. Michels remembered:

When I asked the broad question of why do you think you were brought to the hospital today, or something to that effect, he responded that daddy put his ding-ding in my butt, end quote.

. . . .

My recollection of the history is rather brief, that a four year-old can't give a detailed history. But he did at one point say that he had an owee in his butt that he associated with the incident.

Dr. Michels' physical examination of the CW consisted of general and area-specific visual examinations, and tests for sexually transmitted diseases. The visual examinations yielded nothing of note. The tests were negative. Dr. Michels opined that these results were consistent with both penile penetration of the anus and no penile penetration of the anus.

The CW was seven years old at the time of trial. His trial testimony took most of a morning and part of the afternoon. At the beginning of his testimony, he said he would be unable to recognize his father if he were to see him. He did not know his mother's name. However, when asked whether his father had done something to him he did not like, the CW answered, "He did something bad. . . . He put his penis in my butt." The CW remembered the incident occurred when he was four years old. It happened in the daytime, in the bathroom of his family's residence, after he had removed his clothes for a bath. Montgomery came into the bathroom while the CW was in the tub. Montgomery sat on the toilet seat cover, took down his pants and underwear, and put his penis in the CW's "butt." The CW remembered that he felt "sad" during the act because it hurt "[i]n my butt." The CW confirmed that Montgomery's penis was hard, but he did not know why his father did what he did.

To show what he meant by "butt," the CW used a pen to circle the buttocks on a drawing of a young boy (Exhibit 12). To show what he meant by "penis," the CW circled the genitals on a drawing of a grown man (Exhibit 13). When asked whether he told anyone about the incident, the CW replied, "The baby-sitter." He denied to the prosecutor that he told his mother or that his mother talked to his father about the incident. He also denied that his father spanked him on the day in question. The CW remembered that he did not live with his parents after he reported the incident. "I went to a different house." After he did, "this" did not happen again.

The CW further testified that he was lying face down in the bathtub when his father assaulted him. Then the CW said that his father sat on the toilet and held the CW's legs with one hand. The CW indicated that his father was positioned to his "immediate left side." The CW assumed the position he was in when he was assaulted. It was described for the record as "a laying down position . . . with his stomach flush—with his stomach slightly elevated from the floor."

The prosecutor gave the CW two anatomically correct dolls, which the CW used to show how his father assaulted him. With the larger doll, the CW demonstrated a sitting position. With the smaller doll, the CW demonstrated the same "laying down position" he had assumed earlier in his testimony.

On cross-examination, the CW again denied that his father spanked—or hit or punched—him on the day of the assault. But upon defense counsel's reference to July 14, 1999, the date of his grand jury testimony, the CW remembered he had talked to other people about the incident and told them that his father punched him in the stomach after the sexual assault, and that his mother threw him to the floor. Under further cross-examination, however, the CW confirmed being punched by his father—but before the sexual assault, and denied being thrown to the floor by his mother.

Later in cross-examination, the CW denied saying that anal penetration took place three times—in his father's bed, on the sink and in the bathtub. However, after defense counsel showed him the transcript of his grand jury testimony, the CW agreed he had testified that "it happened in his bed, on the sink, and the bathtub. . . . One, two, three." But when defense counsel asked the CW to acknowledge that this grand jury testimony referred to three separate instances of anal penetration, the CW responded, "I don't really remember." The CW confirmed to defense counsel that his father was sitting on the toilet when the sexual assault occurred, and that his father did not get into the bathtub. A little while later, however, the CW testified that he was in the tub when his father penetrated him.

The CW remembered that his father drove his mother to work the day of the incident, leaving him home alone with his older brother (eight years old at the time of trial), who is "very sick" and largely unable to move. In his father's absence, the CW made himself a breakfast of cereal. The CW denied telling anyone, and specifically "Dr. [June] Ching, a lady[,]" that after he took his bath that morning, his father made him breakfast. The CW did not remember a Dr. Ching or talking to her, until defense counsel mentioned the date, March 15, 2000. However, the CW continued to deny that his father made him breakfast that day. The CW either did not know or could not remember whether his father made "eggs, steak, rice, corn, and sandwich" for breakfast, and he did not recall telling Dr. Ching that. The CW confirmed that he did not eat all of his cereal that morning, but denied throwing some of it on the floor. The CW could not recall whether he made his father angry that morning. The CW did not know whether his father was ever angry that morning, or whether his father scolded him that morning.

The CW recounted going to his babysitter's house the day of the incident, where he told his babysitter what his father had done to him. Later, his father picked him up, then his mother, and drove to a store. When his father went into the store, the CW told his mother about the assault. The CW remembered, however, that his mother acted like she did not hear him. His mother did not, in any later event, examine his body to corroborate his accusation. The CW denied that his mother got angry and threw him on the ground when he told her about the incident. The CW either did not know or could not remember whether he told Dr. Ching that "mommy threw me to the ground after she came back from work[.]" The CW denied telling his mother that his father spanked him, or that he had made his father angry by throwing food on the floor. The CW also denied he ever told his mother that his babysitter punched him and threw him down the stairs. The CW denied telling his mother that other children at his babysitter's house punched, pushed, hurt or otherwise did wrong to him. The day after the incident, the CW again went to his babysitter's house, where a social worker came and picked him up. He did not see his mother and father after that.

On the subject of his medical examination, the CW agreed with defense counsel's characterization that "they cleaned out your butt." When defense counsel asked him how "they" did this, the CW responded, "This little thing." The CW acknowledged he told Dr. Ching that "they" were cleaning "a white thing." However, defense counsel could not

obtain the CW's agreement with or remembrance of a statement of his, reported by Dr. Ching: "Ask what they were cleaning. [The CW] explained that it was white thing that his daddy put in and made it dirty by peeing in his butt." The CW told defense counsel, "I meant this little white thing they was cleaning it with."

The CW remembered the sexual assault was very painful, so painful that he screamed out loud. As a result of the assault, he had a fear and a dislike of his father. He did not want to be with his father, and cried when his father came to pick him up from his babysitter's house the afternoon of the incident. The CW acknowledged to defense counsel that he told his babysitter about his fear and reluctance.

Under redirect examination, the CW remembered telling Dr. Ching that his father put his penis in his "butt." He told Dr. Ching that it happened while he was "upside down laying on daddy[,]" who was seated on the toilet. The CW also recalled telling Dr. Ching that his father punched him before he molested him.

On re-cross examination, the CW denied that his father threw him out of the bathtub, then put him back in, before assaulting him. However, after admitting he had told Dr. Ching as much, the CW agreed that his father had done so. The CW explained his failure to mention these things earlier in his trial testimony: "Because I was thinking.... What I was going to say." The CW clarified that he got back into the tub on his own. He did not know why his father threw him out of the tub in the first place.

Hinda Louise Diamond (Diamond) testified that she is a social worker with the Special Services Assessment Unit of the State's Child Protective Services (CPS). The Unit investigates allegations of sexual abuse. On November 5, 1998, Diamond received such a report from the CW's babysitter, Ethel Ramones (Ramones). On November 9, 1998, Diamond interviewed the CW at Ramones' home. The interview was preliminary, "a way to ascertain his immediate safety[,]" and not recorded. Over Montgomery's hearsay objection, and under Hawai'i Rules of Evidence (HRE) Rule 613(c)(3) (regarding prior consistent statements),[3] Diamond was allowed to testify about what the CW said during the November 9, 1998 interview. Diamond related that the CW told her, "my daddy put his dingy in my butt."

During the November 9, 1998 interview, Diamond showed the CW four anatomically detailed drawings, of "the front and the back of an adult male [ (Exhibits 1 and 2, respectively) ] and the front and the back of a child, a male child [ (Exhibits 3 and 4, respectively) ]." Diamond used the drawings to confirm what body parts the CW was identifying when he used certain words, such as "dingy." Of note were the writing of the word "dingy" and the CW's corresponding marking of the adult male genitalia on Exhibit 1, and the writing of the word "butt" and the CW's corresponding marking of the buttocks of the male child on Exhibit 4. Over Montgomery's objection, Exhibits 1 through 4 were admitted into evidence under HRE Rule 613(c)(3).

After the November 9, 1998 interview, the CW was taken into protective custody and eventually placed in a foster home (the CW was still in CPS custody at the time of trial). In addition, Diamond referred the CW for a sexual abuse examination.

**3.** Hawai'i Rules of Evidence (HRE) Rule 613(c) provides:

(c) *Prior consistent statement of witness.* Evidence of a statement previously made by a witness that is consistent with the witness' testimony at the trial is admissible to support the witness' credibility only if it is offered after:
 (1) Evidence of the witness' prior inconsistent statement has been admitted for the purpose of attacking the witness' credibility, and the consistent statement was made before the inconsistent statement; or

 (2) An express or implied charge has been made that the witness' testimony at the trial is recently fabricated or is influenced by bias or other improper motive, and the consistent statement was made before the bias, motive for fabrication, or other improper motive is alleged to have arisen; or
 (3) The witness' credibility has been attacked at the trial by imputation of inaccurate memory, and the consistent statement was made when the event was recent and the witness' memory fresh.

On November 12, 1998, Diamond conducted a formal, videotaped interview with the CW at the Children's Advocacy Center. The videotape of the interview, Exhibit 15, was admitted into evidence over Montgomery's objection, but as redacted through the cooperation and agreement of counsel to include only HRE Rule 613(c) prior consistent statements. As stated by defense counsel,

> I got together with the prosecutor over the telephone and without waiving my objection we kind of agreed as to what parts of the statement of Hinda Diamond would be played for the Court.

In this connection, the court cited *State v. Ganotisi*, 79 Hawai'i 342, 902 P.2d 977 (App. 1995), and *State v. Corella*, 79 Hawai'i 255, 900 P.2d 1322 (App.1995), and noted that

> a prior consistent statement only comes in on the subject as to which an individual was impeached under one of the three means listed within [HRE] Rule 613(c). So we have a little bit of a limitation here. It's by subject.
>
> And, of course, I think there are a number of cases which stand for the proposition that prior inconsistent statements can only come in—well, they're limited. They—you know, you don't—in other words—well, in terms of what we're talking about here, general impeachment, or impeachment as to credibility, does not open the door to the entire testimony of any given individual. There are limitations.
>
> But putting *Corella* together with *Ganotisi* in this matter, I think that having gone through my notes, the state seems to be entitled to bring in prior inconsistent [ (sic) ] statements dealing with what happened in the bathroom. In essence, the facts at issue.

[DEFENSE COUNSEL]: I guess if you're talking about the subject matter and you're talking about the alleged incident in question.

THE COURT: Well, these are the areas where you impeached him with either prior inconsistent statements or I thought suggestions of inaccurate memory.

[DEFENSE COUNSEL]: All right.

The court went on to mention several instances in which it thought the CW's credibility had been impeached as specified in HRE Rule 613(c). The court then asked defense counsel, "does that comport with what you've done with the video tape?" Defense counsel replied, "Basically it does, Your Honor."

The videotape was played for the court. During the videotaped interview, the CW was able to supply his given name and those of his parents and brother. However, the CW could not supply his parents' surname and "forgot" his own surname. The CW said he was four years old. The CW then identified various household items, such as a bed, a toilet and a bathtub, in a collection of drawings shown to him by Diamond.

Diamond also showed the CW an anatomically correct drawing of a male child, upon which the CW identified "dingy" and "butt," and an anatomically correct drawing of an adult male, upon which the CW identified "big dingy." During this process, the CW twice interjected, "Daddy put his 'dingy' in my butt." He also said, "Daddy put me on the ground and punched my stomach." When Diamond asked the CW what happened after his father punched him, he replied, "Daddy put his 'dingy' in my butt." When Diamond asked the CW how that felt, he responded, "It hurt me.... It's not good to me." As an apparent *non sequitur*, the CW mentioned, "I waste my food."

Diamond then brought out two anatomically correct dolls, one an adult male and the other a male child. As the CW was again identifying "dingy" and "butt" on the dolls, he reiterated that his father "put his 'dingy' in my butt." The CW appeared to demonstrate by putting his finger between the buttocks of the male child doll. He also threw one of the dolls on the floor and said, "Put me in the ground and punched my stomach." Ultimately, the CW did not accede to Diamond's repeated requests to demonstrate with the dolls the position by which the sexual assault was accomplished.

When Diamond asked the CW where the assault occurred, the CW said only that it happened "in my blue house." The CW added, "Daddy is not my friend." The CW said he did not want to go back to his house

anymore, because his father had made him cry. When Diamond asked why he cried, the CW responded, "Because I waste my food." Finally, the CW mentioned, "Doctor and Daddy touch my butt."

Montgomery's wife, Colleen Montgomery (Colleen), the CW's mother, testified briefly for the State on direct examination. She mentioned that her husband drives her to work, "On occasions." On cross-examination, Colleen testified that the CW's older brother was born with cerebral palsy and needs very close care and attention, because he "can't do anything on his own. His mentality is like an infant." Colleen emphasized that the CW and his older brother would not be left home alone under any circumstances.

Colleen recalled that on November 5, 1998, she caught the bus to work. Later that day, the CW told her that he was eating a bowl of cereal when he threw a temper tantrum and pushed the bowl of cereal onto the floor. The CW related that he "got a spanking on his butt, and then daddy gave him a shower, and then he went to the babysitter." Colleen also remembered that the family did not go to a store or shopping that day. The CW seemed normal to her that day. "He was normal as any other day." Colleen was sure the CW never told her at any time that his father had molested him. The CW made no associated complaints of pain. Colleen gave the CW a bath that night, but did not check the CW or his behind. "There was nothing to check for because there was no reason to."

Colleen remembered the CW once told her that his babysitter "threw him down the stairs, threw him on the floor, and beat on his stomach." Colleen thereupon confronted Ramones, who denied the allegation. Colleen then confronted the CW, who admitted it was a lie. Colleen vehemently denied that she herself threw the CW to the ground around the time of the incident.

After Colleen's testimony, the parties stipulated to the admission of a redacted transcript of Ramones' telephone statement to the police. Ramones had died before trial. Ramones told the police that, three or four days before the CW was taken into custody, she was babysitting him in her home when "he told me that daddy put his dingy in my butt and it hurts." The CW kept repeating it, so Ramones took him to the bathroom and checked to see if there was any bleeding. "It looked fine to me, it didn't look like anything was wrong. So I let it go." When Montgomery arrived that evening to pick up his son, the CW left with him willingly and without fear. "He was happy to see the dad." Hence, Ramones did not do anything at that point. "But then, it just stayed in my mind, I couldn't get that out of my mind, because when he went home, I had a hard time thinking, you know, thinking what should I do, should I report this, should I do something? This boy is home now, this might be going on now." So Ramones talked to a friend, who later reported the allegation to CPS.

The State rested after the Ramones transcript was entered into evidence. Defense counsel's oral motion for judgment of acquittal, tendered without argument, was denied by the court.

For the defense, Montgomery took the witness stand as his only witness. Montgomery described the daily routine of his household in November 1998. He maintained he would never leave any of his children home alone. Montgomery described the events of November 9, 1998, when he learned that his sons were taken away by CPS. The first time he saw the CW after that day was at trial. Montgomery remembered that the CW acted "the same as always" around the time of the alleged assault.

Montgomery then testified about November 5, 1998. He got home from work before 6:30 a.m., the time his wife usually took the bus to work. Montgomery was certain his wife took the bus to work that morning. After Montgomery put his older son on the bus to school, he gave the CW a bowl of cereal for breakfast. The CW was being fussy about eating, so Montgomery told him, "eat your cereal so we can hurry up and go." Ultimately, Montgomery had to force the CW to eat his cereal, but the CW knocked his bowl to the floor. Montgomery cleaned up the mess. Angered, Montgomery gave the CW "a smack on his behind[,]" which caused the CW to cry. The spanking was on

the CW's bare behind, because the CW had taken off his clothes for his bath while Montgomery was cleaning up the spilt cereal. Montgomery then bathed the CW, either kneeling next to the tub or sitting on the adjacent toilet seat, as was his wont. After the bath, they left for the babysitter's house. Montgomery denied that he got into the bathtub or took his clothes off during the bath. He denied throwing the CW out of the tub.

Montgomery picked the CW up from the babysitter that afternoon. Montgomery had no problems there. When he arrived, the CW said, "daddy, daddy," and came running. The CW exhibited no nervousness, no crying, and no fear or reluctance to go with him— "Nothing unusual at all." After they picked up Colleen, they went "straight home." They did not go to a store or shopping.

Montgomery testified that the CW never mentioned anything to him about "a dingy in his butt." His wife never mentioned such a thing to him, either. He denied that he pushed the CW to the ground and punched him. He vehemently denied putting his penis into the CW's "butt." He denied ever admitting to anybody that he had done so.

After the close of all evidence, defense counsel renewed his motion for judgment of acquittal, again without argument, which the court again denied. After hearing closing arguments, the court took the case under advisement. On September 12, 2001, the court convened a separate hearing to render its verdict, as follows:

Good afternoon counsel. I just want the record to reflect that State's Exhibits I believe it's 1 through 4 and 12 and 13, the drawings of—the human being drawings that were supposedly marked by the [CW], were received solely for the relevance they bore to the [CW's] prior inconsistent statements.

I've reviewed all of the evidence. Based upon the credible, reliable, and relevant evidence and all reasonable inferences drawn therefrom, the [c]ourt finds that the State has proved all material elements of the offense charged beyond a reasonable doubt and, therefore, adjudges [Montgom- ery] guilty of Sexual Assault in the First Degree.

The [c]ourt also finds from such evidence that jurisdiction, venue, and timeliness, as required by Section 701–114 HRS, were proved beyond a reasonable doubt.

On September 21, 2001, Montgomery filed a motion for new trial, reconsideration of verdict and/or judgment of acquittal. The motion summarily stated two grounds: (1) that the court failed to give or require findings and conclusions in support of its verdict, and (2) that "the weight of the competent evidence does not support the verdict." At the October 18, 2001 hearing on the motion, defense counsel argued, essentially, that Montgomery and his wife were credible while the CW was not. However, the court revealed: "I did not believe [Montgomery] and I did not believe [Colleen].... I believed [the CW] on the salient events." Accordingly, the court denied the motion.

The court's written findings of fact, conclusions of law and adjudication of guilt, filed October 19, 2001, echoed its oral findings on the motion for new trial: "[The CW], [Dr. Michels], [Diamond], and Alfred Ramones [ (Ramones' son) ] are credible witnesses. [Montgomery] and [Colleen] are not credible witnesses." Judgment was entered on December 3, 2001. Montgomery filed his timely notice of this appeal on January 2, 2002.

## II. Discussion.

### A. The Grand Jury Proceedings.

The CW and Diamond testified during the July 14, 1999 grand jury proceedings. Then a grand juror asked how the sexual assault was reported to CPS. The grand jury prosecutor told Diamond not to answer and summoned grand jury counsel. Grand jury counsel also declined to respond to the grand juror's question, choosing instead to simply remind the grand jury that its only function was to determine whether probable cause existed based upon the evidence adduced.

On October 14, 1999, Montgomery filed a renewed motion to dismiss, claiming that the actions of the grand jury prosecutor and grand jury counsel "indicate[ ] that insufficient evidence was presented to reach a

probable cause level since Grand Jurors were not answered and thus it was futile for any of them to participate in determining probable cause." (Citation omitted.) At the October 22, 1999 hearing [4] on the motion to dismiss, the motion was treated, argued and denied as a motion to dismiss for lack of probable cause.

On appeal, Montgomery contends the court erred when it failed to dismiss the indictment in light of the actions of the grand jury prosecutor and grand jury counsel. However, it is clear the motion to dismiss was brought, treated, argued and denied as a motion to dismiss for lack of probable cause. As such, it cannot support a cognizable point of error on appeal after conviction, the point being moot. *In re Doe*, 102 Hawai'i 75, 78, 73 P.3d 29, 32 (2003) ("absent unusual circumstances, any defects in a pretrial determination of probable cause are rendered moot, or are without any effective remedy, which is much the same thing, by a subsequent conviction" (citations and footnote omitted)).

### B. Sufficiency of the Evidence.

■ Montgomery avers the court erred by finding him guilty and by denying his September 21, 2001 motion for judgment of acquittal after verdict. Montgomery's wide-ranging argument on this point may be epitomized by its first sentence: "The weight of the evidence militates against a finding of guilt." In other words, Montgomery attacks the sufficiency of the evidence adduced at trial. Accordingly, on this point we employ the standard of review for sufficiency of the evidence:

> The supreme court has explained that in reviewing a post-verdict motion for judgment of acquittal,
>
>> we employ the same standard that the trial court applies to such a motion, namely, whether, upon the evidence viewed in the light most favorable to the prosecution and in full recognition of the province of the trier of fact, the evidence is sufficient to support a prima facie case so that a reasonable mind might fairly conclude guilt beyond a reasonable

doubt. Sufficient evidence to support a prima facie case requires substantial evidence as to every material element of the offense charged. Substantial evidence as to every material element of the offense charged is credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion. Under such a review, we give full play to the right of the fact finder to determine credibility, weigh the evidence, and draw justifiable inferences of fact.

*State v. Timoteo*, 87 Hawai'i 108, 112–13, 952 P.2d 865, 869–70 (1997).

*State v. Ferrer*, 95 Hawai'i 409, 422, 23 P.3d 744, 757 (App.2001).

■ As detailed above, the court found the State's witnesses credible and Montgomery and Colleen not credible. We will not second-guess its assessment in this respect. *In re Doe*, 95 Hawai'i 183, 197, 20 P.3d 616, 630 (2001); *Ferrer*, 95 Hawai'i at 422, 23 P.3d at 757. In particular, the court found the CW credible. The testimony of a single witness, if found credible by the trier of fact, may constitute substantial evidence to support a conviction. *In re Doe*, 95 Hawai'i at 196–97, 20 P.3d at 629–30. Considering the evidence, detailed above, in the light most favorable to the State, there clearly was substantial evidence adduced at trial sufficient to support Montgomery's conviction. *Ferrer*, 95 Hawai'i at 422, 23 P.3d at 757. This point of error lacks merit.

### C. Evidentiary Matters.

■ For his penultimate point of error on appeal, Montgomery addresses several evidentiary matters. Where "the only question under [a rule of evidence] is whether the specific requirements of the rule were met, there can be no discretion in the trial court. Therefore, the correct standard of review is right/wrong." *Kealoha v. County of Hawai'i*, 74 Haw. 308, 319, 844 P.2d 670, 675 (1993).

---

**4.** The Honorable Michael A. Town, judge presiding.

We address Montgomery's arguments regarding the evidentiary matters *seriatim* and as presented:

> First, it was hearsay for Diamond to testify about out-of-court statements made by [the CW] at [the unrecorded November 9, 1998] interview. Second, it was also hearsay when [the CW] identified human body parts onto the anatomical drawings. Therefore, Diamond should not have been allowed to testify as to these matters. (HRE Rule 801). These matters are not hearsay exceptions because [the CW] was never confronted nor cross-examined concerning the November 9, 1998 interview or his identification of body parts off of four anatomical drawings. (HRE Rule 802.1(2)[5]).
>
> Furthermore, there was a lack of foundation because the State failed to question [the CW] about the unrecorded interview of November 9, 1998, and about the four anatomical drawings.

(Original brackets shown as parentheses; footnote supplied.) This argument is unavailing.

Diamond's testimony regarding what the CW told her during the November 9, 1998 interview covered two subjects: (1) the CW's consistent statement that his father penetrated him anally; and (2) how and why Diamond used the anatomically correct drawings (Exhibits 1 through 4), and how the CW marked them, during the interview. Exhibits 1 through 4 were also admitted into evidence.

With respect to the first subject covered by Diamond's testimony, it is clear from the CW's trial testimony that defense counsel's comprehensive cross-examination was essentially one long impeachment of the CW's credibility vis-à-vis the November 5, 1998 sexual assault, *cf. Corella*, 79 Hawai'i at 262–63, 900 P.2d at 1329–30 (prior consistent statement not admissible under HRE Rule 613(c) because "the statement is not a prior statement which was consistent with the testimony impeached" (citations omitted)); *State v. Palabay*, 9 Haw.App. 414, 428, 844 P.2d 1, 8 (1992) (prior consistent statement not admissible where "Complainaint's credibility was never attacked by any of the [three] means set forth in HRE 613(c)"), accomplished by means of prior inconsistent statements made by the CW after the November 9, 1998 interview, HRE Rule 613(c)(1); *Ganotisi*, 79 Hawai'i at 345, 902 P.2d at 980 ("Stepdaughter was cross-examined regarding her prior inconsistent statements ..., thus satisfying the foundational requirements for use of her [earlier,] prior consistent statements under HRE Rule[ ] 613(c)" (citation omitted)), and/or by means of imputation of inaccurate memory. HRE Rule 613(c)(3); *State v. Altergott*, 57 Haw. 492, 505, 559 P.2d 728, 737 (1977) ("[w]here the judge construes a line of questioning to be directed toward impugning the memory of a witness, then he will allow a consistent statement made when the event was recent and memory fresh to be received in support" (citation and internal quotation marks omitted)).

Montgomery argues that "[t]hese matters are not hearsay exceptions because [the CW] was never confronted nor cross-examined concerning the November 9, 1998 interview.... (HRE Rule 802.1(2))." As is evident from the citation, this argument is misplaced, because while the requirement—that "[t]he declarant is subject to cross-examination concerning the subject matter of the declarant's statement"—is foundational under HRE Rule 802.1(2), which allows the substantive use of prior consistent statements, in other words, for the truth of the matter asserted, it is not a requirement under HRE Rule 613(c), which allows the use of prior consistent statements for rehabilitation purposes:

> This rule [ (HRE Rule 802.1) ] should be understood in connection with [HRE] Rule

---

5. HRE Rule 802.1(2) provides:

> The following statements previously made by witnesses who testify at the trial or hearing are not excluded by the hearsay rule:
>
> ....
>
> (2) *Consistent statement.* The *declarant is* subject to cross-examination concerning the subject matter of the declarant's statement, the statement is consistent with the declarant's testimony, and the statement is offered in compliance with rule 613(c)[.]

613, "Prior statements of witnesses." [HRE] Rule 613(b) governs the use of prior inconsistent statements for impeachment purposes, and [HRE] Rule 613(c) governs the use of prior consistent statements for rehabilitation purposes. The present rule, in contrast, defines those prior statements by witnesses that may in addition be considered by the trier of fact to prove the truth of the matters asserted, that is, as exceptions to the hearsay ban of [HRE] Rule 802.

. . . .

Paragraph (2):[HRE] Rule 613(c) identifies three classes of prior consistent statements that are admissible for rehabilitation purposes. The present paragraph permits substantive use of these statements. This is consistent with prior Hawai'i law, see *State v. Altergott*, 57 H[aw]. 492, 559 P.2d 728 (1977).

HRE Rule 802.1 Commentary. *See also Altergott*, 57 Haw. at 504, 559 P.2d at 736 ("a witness who has been impeached may be rehabilitated by showing prior consistent statements"); HRE Rule 613 Commentary:

. . . the federal rules do not address the issue whether other kinds of consistent statements may be used to rehabilitate witnesses. More specifically, the federal rules provide no answer to the issue posed in *State v. Altergott*, 57 H[aw]. 492, 559 P.2d 728 (1977): when the cross-examination of a witness "amounts only to an imputation of inaccurate memory," can a consistent statement made "when the event was recent and the memory fresh" be admitted to rehabilitate? *Altergott*, relying on McCormick[, *Evidence* ] § 49 [ (2d ed.1972),] answered this question in the affirmative, and the same result is effected by [HRE] Rule 613(c)(3).

Montgomery also argues that "there was a lack of foundation because the State failed to question [the CW] about the unrecorded interview of November 9, 1998." Montgomery cites no supporting authority for this argument, and we are not aware of any. Perhaps

Montgomery is thinking of the rules governing prior inconsistent statements. *See* HRE Rule 613(b).[6]

Hence, while Diamond's recounting of the allegation of sexual assault made by the CW during the unrecorded November 9, 1998 interview may not have been admissible for its substance under HRE Rule 802.1(2), *Palabay*, 9 Haw.App. at 429, 844 P.2d 1, 8 ("the foundational requirements for admission of the videotaped statements under HRE Rule 802.1(2) were never satisfied" because "Complainant was never subjected to cross-examination concerning her prior videotaped statements to the police"), it was admissible to rehabilitate the CW's credibility under HRE Rule 613(c). *Altergott*, 57 Haw. at 505, 559 P.2d at 737; *Ganotisi*, 79 Hawai'i at 345, 902 P.2d at 980. We presume the court observed the distinction, because in a bench trial,

the normal rule is that if there is sufficient competent evidence to support the judgment or finding below, there is a presumption that any incompetent evidence was disregarded and the issue determined from a consideration of competent evidence only.

*State v. Gutierrez*, 1 Haw.App. 268, 270, 618 P.2d 315, 317 (1980) (citations omitted). *See also State v. Vliet*, 91 Hawai'i 288, 298, 983 P.2d 189, 199 (1999). More to the point, we presume the court considered the evidence for rehabilitation purposes and for rehabilitation purposes only. *Cf. People v. Deenadayalu*, 331 Ill.App.3d 442, 265 Ill.Dec. 285, 772 N.E.2d 323, 329 (2002) ("when other-crimes evidence is introduced for a limited purpose, it is presumed that the trial judge considered it only for that purpose" (citation omitted)); *Corley v. State*, 987 S.W.2d 615, 621 (Tex.Ct.App.1999) (in a bench trial, "the danger that the trier of fact will consider extraneous offense evidence for anything other than the limited purpose for which it is admitted is reduced, and the likelihood that the extraneous evidence will unfairly prejudice the defendant is diminished").

6. HRE Rule 613(b) provides:

Extrinsic evidence of a prior inconsistent statement by a witness is not admissible unless, on direct or cross-examination, (1) the circum-

stances of the statement have been brought to the attention of the witness, and (2) the witness has been asked whether the witness made the statement.

384

■ With respect to the second subject covered by Diamond's testimony, any error [7] in the admission of Diamond's testimony anent Exhibits 1 through 4 along with the exhibits themselves was harmless beyond a reasonable doubt, *see State v. Holbron*, 80 Hawai'i 27, 32, 904 P.2d 912, 917 (1995), because defense counsel told the court no less than three times during trial that Montgomery was not questioning the CW's knowledge of the various parts of the body or the terminology the CW used to refer to them.

■ Continuing on with his evidentiary points, Montgomery complains:

Lastly, the defense was provided with copies of the four anatomical drawings, but had no information or knowledge that an unrecorded interview took place between [the CW] and Diamond on November 9, 1998. The defense was take by surprise because it was only after Diamond was on the stand testifying at the trial that the defense was made aware of the unrecorded interview.

Montgomery cites no law in support of this argument, which is not surprising, because there is no such law. We are cognizant of the discovery requirements made incumbent upon the prosecutor by Hawai'i Rules of Penal Procedure (HRPP) Rule 16, but the relevant provisions apply only to "written or recorded statements" of a witness. HRPP Rule 16(b)(1)(i). This argument is devoid of merit.

■ For his final evidentiary point, Montgomery argues:

The defense also objected to the videotaped [November 12, 1998] interview coming into evidence because it allows the trier-of-fact to review and revisit the testimony of [the CW] time and again. This creates the real danger and prejudice that

the trier-of-fact will give more weight to the testimony which was recorded as opposed to the live and once heard testimony of [Montgomery and his wife].

Here again, Montgomery cites no authority for his position. And again, we presume the court resisted "the real danger and prejudice" conjured by Montgomery. *Vliet*, 91 Hawai'i at 298, 983 P.2d at 199; *Gutierrez*, 1 Haw.App. at 270, 618 P.2d at 317. We observe, as well, that the videotape of the November 12, 1998 interview admitted into evidence was redacted by agreement of counsel and contained many of the prior inconsistent statements used to advantage by defense counsel in his cross-examination of the CW.

D. *Cumulative Impact of the Purported Errors.*

At the end of his opening brief, Montgomery throws in this sentence: "The errors enumerated above, when combined, created prejudice whereby there is a reasonable possibility that the prejudice contributed to the conviction." We disagree. "After carefully reviewing the record, we conclude that the individual errors raised by Appellant are by themselves insubstantial. Thus, it is unnecessary to address the cumulative effect of these 'alleged errors.'" *State v. Samuel*, 74 Haw. 141, 160, 838 P.2d 1374, 1383 (1992) (citation omitted).

### III. Conclusion.

For the foregoing reasons, the December 3, 2001 judgment of the court is affirmed.

7. *See State v. Corella*, 79 Hawai'i 255, 262–63, 900 P.2d 1322, 1329–30 (App.1995) (error to admit prior consistent statement under HRE Rule 613(c) where the declarant's credibility was never attacked at trial on the subject matter of the statement):