In the Matter of the Adoption of A MALE MINOR CHILD, Born on February 14, 1971

NO. 6737

NOVEMBER 19, 1980

HAYASHI, C.J., PADGETT AND BURNS, JJ.

OPINION OF THE COURT BY BURNS, J.

The child's natural mother appeals from the lower court's denial of her request to set aside the adoption decree on the grounds that the natural mother's consent was obtained by means of fraud, duress and undue influence.

The natural mother contends that the lower court erred:

1. When it held that her written consent was valid notwithstanding noncompliance with Hawaii Revised Statutes (HRS) § 578-1 and Hawaii Family Court Rules (HFCR), rule 103(f)(5).

2. When it found that she failed to prove her allegations of fraud.

3. When it refused to allow her friend to testify about a conversation between her and her friend which took place in the evening of the day that she signed the consent form.

We disagree with all three of natural mother's contentions.

The child was born on February 14, 1971. His parents divorced in June 1972, remarried each other in November 1972 and again divorced in October 1973. At each divorce, natural mother was awarded custody of the child subject to father's reasonable visitation rights. On November 7, 1974 an order was entered, upon the parents' stipulation, giving custody of the child to father subject to natural mother's reasonable visitation rights. The next day father and adoptive mother married each other.

Natural mother, being dissatisfied with non-specific visitation rights, obtained a stipulation (dated February 27, 1975) and order (dated April 3, 1975) which allowed her visitation of three weekends each month, from Friday at 2:00 p.m. until Sunday at 7:30 p.m., and on the day before Christmas and the day before Thanksgiving.

At this point, primarily because they concluded it was having a bad effect on the child and consequently on them, father and adoptive mother became unhappy with the visitation situation. As a result, the parties stipulated (on May 7, 1975) and obtained an order (on May 23, 1975) awarding custody of the child back to natural mother. Neither document mentioned father's rights of visitation. Until the adoption, father's only subsequent contacts with the child occurred when the child went with adoptive mother and her two children to the Ice Capades show in Honolulu and when the child stayed with father and his new family on the July 4, 1975 weekend.

Upon returning the child to natural mother after the July 4, 1975 weekend, father and adoptive mother clearly communicated to natural mother the following choice: They would have nothing further to do with the child unless natural mother consented to the child's adoption by adoptive mother.

Mr. Asari, the attorney for adoptive mother and father, sent natural mother a letter dated July 28, 1975, which stated:

> I am made to understand that you are willing to sign a consent to allow [adoptive mother] to adopt your son. However, I would wish that you get legal advice as to what you will be signing before I file [adoptive mother's] petition for adoption. Therefore, will you take the enclosed form with you and go to see Mr. Graham. I am sending a copy of this letter to Mr. Graham that he may anticipate you making an appointment to see him.

Mr. Asari sent a copy of the letter to Mr. Graham, an attorney who had represented natural mother with respect to the prior custody and visitation stipulations and orders. However, natural mother did not consult Mr. Graham.

The petition for adoption was filed on August 14, 1975. It contained a "Specific Consent of Legal Parent" form signed by natural mother and acknowledged by a notary public on August 5, 1975. Natural mother testified that she signed it, that she did not sign it before a notary, that she signed it because father was threatening not to have anything to do with the child unless she signed it and because father and adoptive mother promised her that she would continue to have visitation rights.

Father and adoptive mother admitted that they presented natural mother with an "either you or us" choice but denied that they promised her continued visitation.

The consent form signed by the natural mother stated in the last paragraph above her signature "that no representations have been made to the undersigned by anyone which would serve in any way to limit the complete surrender of all of the undersigned's parental rights intended by this consent or to limit the parental rights to be acquired by the proposed adoptive parent hereinabove named".

The adoption hearing occurred on September 5, 1975 between 1:33 p.m. and 1:55 p.m. Natural mother testified that prior to the hearing she went to father's house to go

with him to the hearing but he convinced her not to go by telling her that her presence would upset the child. Father testified that natural mother said she had some place else to go.

The next day natural mother went to father's house to visit the child and was told that it was the "first and last visit you'll ever have" and she has thereafter been denied any visitation or contact with the child. Some time later, natural mother moved to Hilo. The decree of adoption was filed on September 15, 1975. Natural mother remarried on March 26, 1977. On May 5, 1977 she petitioned the lower court to set aside the adoption decree because her consent was obtained by means of fraud, duress and undue influence.

The lower court found "no evidence of fraud in securing said consent" and that natural mother "understood all legal ramification [sic] of an adoption proceeding prior to and at the time of the execution of the consent" by her.

## I. FORM OF CONSENT.

Natural mother contends that her consent was invalid because it was not duly acknowledged before a notary. This was a disputed issue of fact on which natural mother and father offered conflicting testimony. The record indicates that the trial judge made a finding that the natural mother's consent was in fact duly acknowledged. In his oral decision at the conclusion of the case, the trial judge stated:

> Now insofar as the facts of this case, the court will find, first of all, that the petitioner in the adoption, [adoptive mother], did adopt the child in which is in Adoption No. 1033, and on file therein is a written consent of the movant, [natural mother], which is dated August 5, 1975, and duly notarized.

Such a finding, depending on the trier of fact's view of the credibility of the witnesses, is entitled to great weight on review. *Watumull v. Ettinger*, 39 Haw. 185 (1952). We find no reason to disturb it in this case.

There is a further basis for our holding against natural mother on this issue. HRS chapter 578 is the product of Act 115 of the 1953 legislative session. In passing on the bill (SB 302) that led to Act 115, both the Senate (in SCR 197, 1953 Sen. Journal) and the House (in SCR 578, 1953 House Journal) indicated that the bill was largely based on recommendations contained in U.S. CHILDREN'S BUREAU PUBLICATION NO. 331-1949, ESSENTIALS OF ADOPTION LAW AND PROCEDURE.

With respect to parental consents, the publication recommended that they be sworn to by the person consenting. The 1953 legislature chose not to change the existing law (Revised Laws of Hawaii (RLH) 1945, as amended, § 12271) which only required written consents. Thus, the applicable statute, HRS § 578-2, only requires a written consent. It does not require a notarized consent.

HFCR, rule 169(f)(5), which was adopted by the Board of Family Court Judges, effective September 1, 1972, specified no required form for the consent. This rule was inapplicable to the facts of this case. *See Cleveland v. Cleveland,* 57 Haw. 519, 559 P.2d 744 (1977); *Tavares v. Tavares,* 58 Haw. 541, 574 P.2d 125 (1978).

Current HFCR, rule 103(f)(5), requires a duly acknowledged consent but it did not take effect until February 15, 1977 and therefore is not applicable to the facts of this case.

II. FRAUD.

Prior to the 1953 amendments, Hawaii's adoption law provided:

> Sec. 12276. Decree. ***At any time within one year from the date of entry of any decree of adoption, the judge may, for good cause, set aside or modify such decree***

The U. S. CHILDREN'S BUREAU PUBLICATION NO. 331-1949 recommended "that 2 years from the date of a decree of adoption any irregularity in the proceeding shall

be deemed cured and the validity of such a decree shall not thereafter be subject to attack on such grounds in any collateral or direct proceedings".

The 1953 legislature, however, chose to add the following paragraph to section 12276:

Sec. 12276. Decree. ***No decree of adoption shall be subject to attack in any collateral proceeding, and, after the expiration of one year from the date of its entry, no decree of adoption shall be subject to direct attack upon any ground other than fraud rendering the decree void as of the time of its entry.

The statute applicable to this case, HRS § 578-12, is essentially the same as the relevant portion of section 12276, RLH 1945, as amended in 1953. In view of the legislative history and of the plain language of the statute, we hold that HRS § 578-12 is a one year statute of limitations prohibiting any direct or collateral attack on adoption decrees except on the ground of fraud.

Natural mother contends that fraud includes duress and undue influence. She further contends that she proved at least one of the three.

Fraud, duress and undue influence are three independent and distinct concepts. "Fraud" is the intentional perversion of truth for the purpose of inducing another in reliance upon it to part with some valuable thing belonging to him or to surrender a legal right. BLACK'S LAW DICTIONARY 594 (5th ed. 1979). "Duress" is a condition where one is induced by wrongful act or threat of another to do an act contrary to his free will. *Id*. at 542. "Undue influence" is the misuse of a position of confidence or the taking advantage of a person's weakness, infirmity or distress to change improperly that person's actions or decisions. *Id*. at 1370.

Although duress and undue influence are sometimes characterized as species of fraud, we believe that in the context of this statute the legislature intended a narrower construction of the term "fraud". The statute bespeaks a policy of allowing the court to set aside a decree "for good cause" at any time within a year of its entry but clearly

and sharply curtails the grounds for setting a decree aside thereafter. By its nature, fraud involves deception, which may not come to light during the year following entry of the decree. Duress and undue influence, however, do not depend on deception, but rather on the overcoming of one's free will. In our view, it is likely that the victims of duress or undue influence will become aware of their victimization within a year, if ever. A victim of fraud, however, might not.

We do not decide whether natural mother has established duress or undue influence. We hold that HRS § 578-12 provides that a decree of adoption may not be attacked after the expiration of one year from the date of its entry upon the grounds of duress or undue influence. We hold that the word "fraud" in HRS § 578-12 means fraud and it does not mean fraud, duress and undue influence.

Having commenced her attack on the decree more than one year from the date of its entry, natural mother cannot succeed unless she proves fraud. The only evidence she produced in this respect was her testimony that she was induced to give her consent to the adoption by father's and adoptive mother's alleged promises that she would continue to have visitation rights. Father and adoptive mother testified that they made no such promises.

We question but do not decide whether such a promise could support a finding of fraud. *See Kyles v. Lantis*, 39 Haw. 440 at 444 (1952), and *Stahl v. Balsara*, 60 Haw. 144, 587 P.2d 1210 (1978). The lower court's finding of fact that there was no fraud compels the conclusion that it found for the father and the adoptive mother on the issue of credibility. We do not perceive any error in that finding. *See Watumull v. Ettinger, supra*.

## III. ADMISSIBILITY OF EVIDENCE.

Natural mother contends that the court erred when it excluded her friend's testimony about what natural mother

told her (during a conversation of four to five hours between them in the evening of the day that she signed the consent form) about why she signed the papers.

A prior consistent statement of a witness who has merely testified on direct examination, without impeachment, is ordinarily excluded because it is unnecessary and valueless. 4 Wigmore, Evidence § 1124 (Chadbourn rev. 1970), cited in *State v. Altergott*, 57 Haw. 492 at 502, 559 P.2d 728 at 736 (1977). If the witness's credibility is impeached by an express or implied charge that his or her testimony is of recent fabrication, the product of bias, interest, corrupt influence, contrivance to falsify, or want of capacity to observe or remember, further analysis is required. *See* Cleary, *McCormick's Handbook of the Law of Evidence*, § 49 (2d ed. 1972).

In the case at bar, there was no express contention that natural mother's testimony fit any of the aforementioned descriptions. However, natural father and adoptive mother contradicted her testimony, denying that they had ever made representations to her that she could continue to see her son after the adoption, thus impliedly impeaching her credibility. *See McCormick, supra*, § 47 at 99.

In such a situation, the applicable principle is that the prior consistent statement may not be used to refute the impeachment unless the consistent statement was made before the source of the bias, interest, influence or incapacity originated. *Id.* at 105, n.88, and cases cited therein. As a foundation to the admission of the prior consistent statement, the party seeking admission must establish that the statement was made at a time prior to the existence of motive, interest or fabrication. *Watson v. Los Angeles Transit Lines*, 157 C.A.2d 112, 320 P.2d 890 (1958).

However, the facts on record indicate just the opposite. Natural mother's friend testified that the reason for the conversation was:

> [WITNESS:] She has to because she had to, she had to, you know, in a sense make me believe why she, you know, why she signed the papers, because if she didn't

convince me, there was no way in hell she was going to convince her parents.

A parent who is explaining why she agreed to the adoption of her child by another has reason to dissemble with respect to collateral agreements concerning visitation. We conclude, therefore, that the record supports the trial judge's exclusion of the proffered testimony.

IV. CONCLUSION.

Finding no error, we affirm.

*Michael R. Salling* (with him on the brief *Lehua Fernandes Salling*) for petitioner-appellant (natural mother).

*Tatsuo Asari* for respondent-appellee (adoptive mother).