**Electronically Filed
Intermediate Court of Appeals
CAAP-19-0000600
30-NOV-2020
07:55 AM
Dkt. 108 MO**

NO. CAAP-19-0000600
(Consolidated with No. CAAP-19-0000602)


IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAIʻI

**CAAP-19-0000600**

IN THE INTEREST OF KKA, BORN ON 00/00/0000

APPEAL FROM THE FAMILY COURT OF THE FIRST CIRCUIT
(FC-S No. 19-00026)

and

**CAAP-19-0000602**

IN THE MATTER OF THE ADOPTION OF A FEMALE CHILD,
BORN ON 00/00/0000 BY KA AND LA, HUSBAND AND WIFE

APPEAL FROM THE FAMILY COURT OF THE FIRST CIRCUIT
(FC-A No. 05-1-0502)


**MEMORANDUM OPINION**
(By:  Leonard, Presiding Judge, Hiraoka and Nakasone, JJ.)

Petitioner-Appellant State of Hawaiʻi Department of Human Services (**DHS**) appeals from orders entered by the Family Court of the First Circuit[1] in two cases concerning the same adopted minor child.  In CAAP-19-0000600, DHS appeals from the "Orders [sic] Concerning Child Protective Act" entered in FC-S No. 19-00026 (the **Child Protective Act Case**) on August 13, 2019.  In CAAP-19-0000602, DHS appeals from the "Orders [sic] Setting Aside and Rescinding the Adoption Decree Filed on January 13, 2006[,]" entered in FC-A No. 05-1-0502 (the **Adoption Case**) on

---

[1]    The Honorable Bode A. Uale entered the orders on appeal.

August 13, 2019.  We consolidated the appeals on September 4, 2019.

For the reasons explained below we vacate both orders, without prejudice to further proceedings in the Child Protective Act Case.

## BACKGROUND

KKA (**Child**) was born in 2003.  The parental rights of Child's natural mother and father were terminated by order of the family court on February 8, 2005.

KA (**Adoptive Father**) and LA (**Adoptive Mother**) filed the Adoption Case, seeking to adopt Child.  The family court entered "Findings and Decision of the Court Granting Petition for Adoption" and an **"Adoption Decree"**.  KA and LA became Child's adoptive parents effective December 20, 2005.  Child was two years old at the time.

Adoptive Father died in 2018, when Child was 15 years old.  At some point after Adoptive Father's death, Adoptive Mother and Child moved to Virginia with Adoptive Mother's fiancé.  Adoptive Mother's fiancé works for the federal department of defense.  The following findings of fact by the family court are unchallenged:[2]

> 3.    [Child] stated to adoptive mother that she did not want to be with her and that she wanted to return to her biological mother
>
> . . . .
>
> 7.    While in Virginia, [Child] got into drugs and she was placed in an Alternative Learning Center ("ALC").  Adoptive mother was concerned about [Child] being exposed to bad influences while at the ALC.
>
> 8.    In addition, [Child] used marijuana.
>
> 9.    [Child]'s marijuana use could jeopardize adoptive mother's fiancé's job [with the federal department of defense].
>
> 10.    Adoptive mother sent [Child] to Hawaiʻi under Power of Attorney ("POA") to live with [Child's] adult sister[.]

---

[2]    The family court entered identical findings of fact and conclusions of law in the Adoption Case and in the Child Protective Act Case.

11.  In September 2018, [Child] ran away from her sister's home to stay with her biological mother.

12.  During this time, [Child]'s biological mother became homeless, and [Child] lived with her on the beach.

13.  This runaway behavior was the same type of behavior [Child] engaged in in Virginia — running away, interference and defiance.

14.  Adoptive mother resided in Virginia while [Child] resided in Hawaiʻi, and there was no legal caretaker for [Child] in Hawaiʻi, despite the POA.

15.  Adoptive mother tried to get [Child] to return to Virgina [sic], but [Child] continued to run away from her adult sister.

16.  [Child] was then arrested and placed into the Kapolei Detention Center pending her return to her adoptive mother in Virginia.

17.  [Child] expressed to adoptive mother that she did not want to live with adoptive mother.

18.  [Child] expressed to adoptive mother that she did not want to live in Virginia.

19.  [Child] expressed to adoptive mother that she did not want to live with adoptive mother's eldest daughter, who currently resides in Las Vegas, Nevada, which was the original plan.

    . . . .

22.  In January 22, 2019, DHS assumed placement responsibility for [Child] based on [alleged] physical neglect by adoptive mother.  On that date, [Child] was placed in an emergency shelter to last through to [sic] May 10, 2019.

    . . . .

24.  While placed at the emergency shelter, she ran away for a period of four weeks.  She eventually returned.

25.  On June 28, 2019, she again ran away from her placement at the shelter.

26.  [Child] wishes to remain in Hawaiʻi with her birth mother or adult sister.

    . . . .

28.  On March 23, 2019, Foster Custody of the [Child] was awarded to the DHS.

    . . . .

30.  On July 15, 2019, a review hearing was held by the Honorable Bode A. Uale. . . .

31.  At that hearing, and after colloquy, the Court found that [Child]'s adoptive mother . . . "knowingly,

3

willingly, and voluntarily waived her right to counsel and proceeded pro se at today's hearing." . . .

32. The Court further found, after colloquy, that "[Adoptive Mother] knowingly, willingly, and voluntarily consented and agreed [sic] to rescind and set aside the adoption of [Child]" and "the adoptive mother . . . has knowingly, voluntarily, and willingly consented to rescind the adoption of [Child] and the adoption is set aside."

On July 15, 2019, in the Child Protective Act Case, the family court entered an order setting aside the Adoption Decree and discharging Adoptive Mother as a party. DHS moved for reconsideration. The motion was heard on August 13, 2019. The family court denied reconsideration and entered the orders in the Child Protective Act Case and the Adoption Case from which DHS appeals.

**STANDARD OF REVIEW**

[T]he family court possesses wide discretion in making its decisions and those decision[s] will not be set aside unless there is a manifest abuse of discretion. Thus, we will not disturb the family court's decisions on appeal unless the family court disregarded rules or principles of law or practice to the substantial detriment of a party litigant and its decision clearly exceeded the bounds of reason.

Fisher v. Fisher, 111 Hawaiʻi 41, 46, 137 P.3d 355, 360 (2006) (citation omitted).

The family court's findings of fact are reviewed under the "clearly erroneous" standard. Fisher, 111 Hawaiʻi at 46, 137 P.3d at 360. A finding of fact is clearly erroneous when the record lacks substantial evidence to support the finding, or despite substantial evidence in support of the finding, we are nonetheless left with a definite and firm conviction that a mistake has been made. Id. "Substantial evidence" is credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion. Id. "It is well-settled that an appellate court will not pass upon issues dependent upon the credibility of witnesses and the weight of evidence; this is the province of the trier of fact." Id. (citation omitted).

The family court's conclusions of law are ordinarily reviewed de novo, under the right/wrong standard, "and are freely reviewable for their correctness." Fisher, 111 Hawaiʻi at 46, 137 P.3d at 360. However, when a conclusion of law presents mixed questions of fact and law, we review it under the "clearly erroneous" standard because the court's conclusions are dependent on the facts and circumstances of each individual case. Estate of Klink ex rel. Klink v. State, 113 Hawaiʻi 332, 351, 152 P.3d 504, 523 (2007). A conclusion of law that is supported by the trial court's findings of fact and reflects an application of the correct rule of law will not be overturned. Id.

## DISCUSSION

DHS contends the family court erred by: (1) setting aside Child's adoption by Adoptive Mother for reasons not authorized under Hawaii Revised Statutes (**HRS**) § 578-12; and (2) relying upon "the best interests of the child" to set aside the Adoption Decree.[3]

### 1.  The family court erred by setting aside the Adoption Decree in the Adoption Case.

HRS § 578-12 (2018) provides, in relevant part:

At any time *within one year* from the date of entry of any decree of adoption, the court may, for good cause, set aside or modify the decree and, in connection therewith, may make appropriate orders, concerning the custody of the minor child and the disposition and handling of the record of adoption by the department of health. The setting aside or modification of any decree of adoption shall not affect any property rights which have become vested between the date of the entry of the decree or the effective date of the decree and the effective date of any order setting aside or modifying the decree of adoption.

*No decree of adoption shall be subject to attack in any collateral proceeding*, and, *after the expiration of one*

---

[3]     DHS's statement of points also challenges the family court's finding of fact no. 34(a) and conclusions of law nos. 1-5, but the opening brief presents no discernable arguments on those issues and we deem the points waived. Hawaiʻi Rules of Appellate Procedure, Rule 28(b)(7); see In re Guardianship of Carlsmith, 113 Hawaiʻi 236, 246, 151 P.3d 717, 727 (2007) (noting that an appellate court "may disregard a particular contention if the appellant makes no discernable argument in support of that position") (cleaned up) (citations omitted).

> ***year from the date of its entry, no decree of adoption shall be subject to direct attack upon any ground other than fraud rendering the decree void as of the time of its entry.***

(Emphasis added.)

DHS argues that the family court erred in 2019 when it set aside the 2006 Adoption Decree. We agree for three reasons. First, the Child Protective Act Case was a proceeding collateral to the Adoption Case. HRS § 578-12 prohibits a collateral attack on a decree of adoption; the family court lacked authority to order the Adoption Decree set aside as part of the Child Protective Act Case.

Second, we have held that HRS § 578-12 is a one-year statute of limitations prohibiting a direct attack on an adoption decree except for fraud which renders the decree void ab initio. In re Adoption of Male Minor Child, 1 Haw. App. 364, 370, 619 P.2d 1092, 1097 (1980). In the Adoption Case, the family court set aside the Adoption Decree 13 years after the decree was entered, on grounds other than fraud; the family court erred when it set aside the Adoption Decree in the Adoption Case.

Third, HRS Chapter 578 was enacted based largely upon recommendations contained in U.S. Children's Bureau, Pub. No. 331-1949, Essentials of Adoption Law and Procedure (1949), https://babel.hathitrust.org/cgi/pt?id=mdp.39015018389950&view=1up&seq=1. In re Adoption of Male Minor Child, 1 Haw. App. at 369, 619 P.2d at 1096. The federal publication states:

> Adoption establishes a permanent relationship. With the provision of adequate social study and supervision before the decree is granted, there should be no need for annulment.
>
> The adoptive parent has recourse to the remedies that are available to a natural parent: [they] may formally relinquish the child; consent to the child's adoption; . . . or disown [the child] when [their] will is made. ***The adopting parents' rights may be terminated when necessary by the court in accordance with the provisions existing for the protection of children.***

Essentials of Adoption Law and Procedure at 22-23 (emphasis added). As discussed in the next section, HRS § 571-61(a) contemplates relinquishment of parental rights for an adopted

child. It was error for the family court to set aside the Adoption Decree.

**2. The family court erred when it terminated Adoptive Mother's parental rights in the Child Protective Act Case.**

DHS filed the Child Protective Act Case in the family court under HRS §§ 571-11 (2018) and 587A-5 (2018). Those statutes provide, in relevant part:

> **[§ 571-11] Jurisdiction; children.** Except as otherwise provided in this chapter, the [family] court shall have exclusive original jurisdiction in proceedings:
>
> . . . .
>
> (9) For the protection of any child under chapter 587A[.]
>
> **[§ 587A-5] Jurisdiction.** Pursuant to section 571-11(9), the [family] court shall have exclusive original jurisdiction:
>
> (1) In a child protective proceeding concerning any child who is or was found within the State at the time specified facts and circumstances occurred, are discovered, or are reported to [DHS] . . . [that] constitute the basis for the court's finding that the child's physical or psychological health or welfare is subject to imminent harm, has been harmed, or is subject to threatened harm by the acts or omissions of the child's family[.]

The family court found, and DHS does not contest, that Child told Adoptive Mother she did not want to be with Adoptive Mother in Virginia, and wanted to return to her biological mother. Adoptive Mother sent Child with a power of attorney to live with Child's adoptive sister in Hawaiʻi. Child ran away from her adoptive sister's home to stay with her biological mother. Child's biological mother was homeless; they lived on the beach. Adoptive Mother tried to get Child to return to Virginia, but Child continued to run away from her adoptive sister. Child was arrested and placed into the Kapolei Detention Center. Child ran away from the detention center, and a warrant for her arrest was issued.

During a review hearing conducted on July 15, 2019, the family court had the following colloquy with Adoptive Mother, who attended the hearing in person and agreed to relinquish her parental rights:

>          THE COURT: Okay. Well, you still live in Virginia then, right?
>
>          [ADOPTIVE MOTHER]: I do live in Virginia.
>
>          THE COURT: Okay. The problem is is that she's here and you're not here. So when there's no legal caretaker, then the State has to step in and try to provide her with shelter. I know you sent her with a power of attorney, is that right?
>
>          [ADOPTIVE MOTHER]: Yes.
>
>          THE COURT: Okay. So that -- that doesn't really work for everything because of her age and all of the things that she needs. It's really up to you. If you -- if you -- if you want to fight for her and -- are you planning on taking her back with you to Virginia? What is your plan?
>
>          [ADOPTIVE MOTHER]: Well, originally, before all of this started, I was trying to get her to come back to Virginia. But she kept running away so it was just impossible for me to get her back. And then when she got into more trouble and was placed in the detention home, I couldn't take her back. And so while she was on the run, you know, she would text me sometimes and tell me that she's okay. So I had told her, you know, turn yourself in, [Child], because it's not right for you to be out there, it's not safe.
>
>          THE COURT: Yeah.
>
>          [ADOPTIVE MOTHER]: Turn yourself in and tell them, you guys, what you want because I can't do it for you no more. If I could do it for you, I would do it for you but -- but I can't -- I can't make you do what is right. I can't make the decisions for you. I can, but it doesn't mean that you're going to do it, which is where I'm at right now. And so she did. She listened to me. That night, she turned herself in. She knows she was going to detention home, which she went.
>
>          And, you know -- and then I got the report and I -- well, I got the court paperwork after I got the phone call from here. When you guys did the first proceeding and when I read the paperwork, it said that I'm being charged for neglect. I guess I'm being charged for neglect basing on the fact that I couldn't get my child back to Virginia in my custody, is because she kept running away. But, you know, it was then that she said she doesn't want to live with me. She doesn't want to live with me. She doesn't want to live in Virginia. She doesn't want to live with my daughter who was part -- the reason I -- my daughter came into the picture was because she was part of the adoption plan in the beginning. She -- my daughter currently now resides in

Nevada, in Las Vegas, and she said she doesn't want to live with my daughter, she doesn't want to live in Las Vegas.

She wants to live with her mother, her birth mother, or her oldest sister[.] And so, you know, if that's what she wants, then that's what I'm going to advocate for. I know it's not the best place for her, but forcing her to live with me even though I want to bring her back with me, it's not going to help solve whatever is going on in her mind.

For me, I think what I would want for her, I want her to be with me because I know I'm the best person to provide care for her. But being the best caretaker doesn't mean that I'm the best person for her. And she had already stated that she doesn't want to be with me. So at this point, I do believe that forcing her to come back with me to Virginia is not going to be in her best interest. And she had said if she can't live with her mom or live with her sister, she would want to age out of the system 'cause she was comfortable being where she was. Apparently, that's not so anymore because she's gone again, you know, and --

THE COURT: Well, let me just say that I -- I don't -- I don't believe you've been neglectful. I think you've tried your best to help her. You know, when they turn 16, 17, kind of hard to force anybody to do anything, and that's how I see her because we've had her in our custody and tried to help her. She ran. It's kind of hard to tell any 16-year-old what to do.

[ADOPTIVE MOTHER]: Yeah.

THE COURT: Yeah? And so is there a warrant out for her arrest on the J side or not?

. . . .

[DEPUTY A.G.]: There is.

. . . .

THE COURT: Okay. It's really up to you, ma'am. What I can do is I -- like I said, I don't believe you've been neglectful. You've been a unfortunate mother to a 16-year-old who's basically going to do what she going to do. If you want, I can -- if you want me to -- because I don't believe that I'm -- forcing her to go back to you is going to help, 'cause even if we -- we force her to go back, she's not going to -- she going board the plane, what you going to do? You not going do -- you not going be able to force her to get on the plane. And even if she gets on the plane, once she's in Virginia, if she runs again, then she runs, you know.

If you'd like me to, I can rescind the adoption, and then we can work with her within the system. You can go back to Virginia. And I know this is not the optimum thing because I know you love her and care for her, but I don't think that we're -- I mean even -- you're not -- how long are you here for?

[ADOPTIVE MOTHER]: I -- I have to go back to work on the 28th.

THE COURT: See, so even that time, we -- we not sure if we can get her back.

. . . .

. . . Because she's on the run. The police are probably going to -- we -- we cannot do anything until they come back for a hearing.

. . . .

. . . And, you know, in four days, you got to go back. So my offer to you -- and I -- I make no judgment on you, ma'am, because I think you've tried your best. I mean, you even had your daughter try to take care of her. But [Child] going do what [Child] wants to do --

[ADOPTIVE MOTHER]: Yes.

THE COURT: -- you know. She -- she's got a mind of her own, and unfortunately, she's not making some good choices. So if you'd like me to, I can set aside the adoption, she can be back in DHS custody, and then we can try to reunify her with her mom folks if that's what she wants. But we got to get her back. So if -- if she -- if we can get her back, we can try to do that. So it's up to you. I don't want to make you go through a trial because a trial, I mean, what -- what will that accomplish? Nothing really, because we can't really force her to do anything. As a judge, even me, I cannot force her to go anywhere or do --

[ADOPTIVE MOTHER]: Yeah.

THE COURT: -- anything. So when I talk to kids, I tell them you got to do this and if you don't do it, there's consequences. You know what I mean? You got to go here, stay there. But if they -- if they go there and they run away, I mean, you know, the next thing is just try to do the next step to try to help them.

So, [Adoptive Mother], it's up to you. If you want me to go ahead and set aside the adoption today, that way, you can go on living your life. Hopefully, she still have some connection to you. You can talk to her and help her as you can. But at least you will not be responsible for her. She's back in the system. We don't know where she is. We'll try to get her back, and we'll do our best to do that, and then we can try, once we get her back, to try to see if we can reunify her with her mother folks or with the oldest sister. But we got to get ahold of them and see what their status is and what their situation is even before we do that.

So what -- what would you like me to do?

[ADOPTIVE MOTHER]: I -- I would like to move forward with your suggestion to rescind it, not because I don't love her but because I do love her and I don't think that I'm the best person for her right now. It's not me. She needed me when she was baby. But now that she's so old and she's making her own choices and sadly it's not the right choices, you know. I've been praying -- I pray for all my kids. I pray that they all never have to go through this, and I get

[Child] going through this, you know. But I would like to rescind it so that she can get the proper care that she need for -- to become a -- a contributing citizen to the community.

THE COURT: Okay. And like I said, I make no judgment on you. I believe that you've tried your best. You even went to the extent of sending her to your daughter to try to help her. [Child] is -- she's almost an adult. She's going to have to make better choices for herself. And I'm hoping she does. But in the meantime, I'm going to go ahead and do what I said because you agree. I'm not doing it unless you agree so if you --

[ADOPTIVE MOTHER]: I -- I agree.

THE COURT: If you agree, I'm going to set aside the adoption, and I'm going to award foster custody to [DHS], and then we'll go from there. Hopefully we can get her back and try to help her the best that we can. I don't -- I don't believe you neglected her. I think you tried your best to help her. But at that age, she just have to make better choices in her life. And hopefully we can help her because it is not a safe world out there.

. . . .

. . . But in the meantime, I think the best course of action is we try to help her from within -- within DHS and try to assist her on the juvenile calendar, 'cause she got a hearing, too, and do our best to get her back in from the cold and try to help her to straighten up a little bit and make some better choices for herself.

[ADOPTIVE MOTHER]: Thank -- thank you --

THE COURT: Okay --

[ADOPTIVE MOTHER]: -- you know.

THE COURT: -- so based on my conversation with adoptive mother, I'm going to set aside the adoption, award foster custody to the [DHS].

During the August 13, 2019 hearing on DHS's motion for reconsideration, the family court explained:

Okay. Well, so we have a situation here where we have a child that was basically out of control of an adoptive mother. Adoption was performed here via DHS. And so she sent her daughter to be with an older daughter. . . . And then that daughter was not able to control her. . . .

. . . .

Anyway, with regard to adoptive mother, . . . she did come in and tell me how it had stressed her and that the daughter would not stay with her where -- where she's at. I believe -- is she in Virginia?

. . . .

11

> . . . In Virginia.  And the daughter was on the run.
> So we have the girl back.  The [adoptive] mother lives in
> Virginia.  It would do nothing.  It would be no -- do no
> good for this child to try to force her on an airplane to go
> back to her mother -- her adoptive mother where she does not
> want to be.  She is here.  Mother lives in Virginia.
> [Child] will not go back.  Sounds like a CPS case to me.
>
> . . . [DHS's] motion [for reconsideration] is denied.
> I believe it is in the best interest of this child that my
> order is maintained.  I do believe that this child can be
> helped, but I think we need to help her from our vantage
> point rather than sending her back to her [adoptive] mother
> who cannot control her and most likely will find her back
> here in Hawaii in no time if I were -- if -- even I were
> able to get her to go back to Virginia.  Therefore, based on
> all of those factors and the fact -- in fact, I'm going to
> appoint a -- an attorney for the girl.
>
> . . . .
>
> Okay, I'm going to appoint an attorney for the girl to
> advocate for her rights, and then we'll go from there.

Based on the substantial evidence in the record, it appears that the family court suggested and accepted Adoptive Mother's relinquishment of parental rights to (in the words of the court) "try to see if we can reunify [Child] with her [biological] mother folks or with the oldest sister."  However, HRS § 571-61 provides, in relevant part:

> (a)  Relinquishment.  The parents or either parent or the
> surviving parent who desire to relinquish parental rights to
> any natural or adopted child and thus make the child
> available for adoption or readoption, may petition the
> family court of the circuit in which they or he or she
> resides, or of the circuit in which the child resides, or
> was born, for the entry of a judgment of termination of
> parental rights.  The petition shall be verified and shall
> be substantially in such form as may be prescribed by the
> judge or senior judge of the family court.

To relinquish her parental rights, Adoptive Mother was required to file a verified petition with the family court.  Adoptive Mother stated her desire to relinquish her parental rights during the July 15, 2019 hearing in the Child Protective Act Case, but the record does not reflect that Adoptive Mother was sworn to tell the truth before her colloquy with the family court.  The family court exceeded its authority when it accepted Adoptive

Mother's apparent relinquishment of parental rights without following the procedure prescribed by HRS § 571-61(a).[4]

## CONCLUSION

Based upon the foregoing, the "Orders [sic] Setting Aside and Rescinding the Adoption Decree Filed on January 13, 2006[,]" entered in FC-A No. 05-1-0502 on August 13, 2019, is vacated. The "Orders [sic] Concerning Child Protective Act" entered in FC-S No. 19-00026 on August 13, 2019, is vacated, without prejudice to further proceedings in the family court consistent with HRS § 571-61.

DATED: Honolulu, Hawaiʻi, November 30, 2020.

On the briefs:

Nara E. Sitachitta,
for Petitioner-Appellant
State of Hawaiʻi
Department of Human Services.

Crystal K. Glendon,
for Respondent-Appellee
Court Appointed Special
Advocates Program.

/s/ Katherine G. Leonard
Presiding Judge

/s/ Keith K. Hiraoka
Associate Judge

/s/ Karen T. Nakasone
Associate Judge

---

[4] HRS § 571-61(b) (2018) authorizes the family court to involuntarily terminate the parental rights of any legal parent on the grounds set forth in the statute. The family court made no findings in the Child Protective Act Case that would support involuntary termination of Adoptive Mother's parental rights.